## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| EASTSIDE INVESTORS, LLP, derivatively on Behalf of Nominal Defendant UNIVERSAL HEALTH SERVICES, INC., | ) ) ) **CIVIL ACTION NO.** |
| Plaintiff, | ) ) |
| vs. | ) ) ) |
| ALAN B. MILLER, ROBERT HOTZ, ANTHONY PANTALEONI and STEVE G. FILTON | ) ) ) **JURY TRIAL DEMANDED** |
| Defendants, | ) ) ) |
| and | ) ) |
| UNIVERSAL HEALTH SERVICES, INC. | ) ) |
| Nominal Defendant. | ) |

### SHAREHOLDER'S DERIVATIVE COMPLAINT

Plaintiff, Eastside Investors, LLP ("Eastside" or "Plaintiff"), derivatively on behalf of Nominal Defendant Universal Health Services, Inc. ("UHS" or the "Company") for its complaint against Defendants, alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation of counsel, which included, among other things, a review of UHS's public documents, announcements, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and concerning UHS and information readily available on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

This is a shareholder's derivative action brought in the right and for the benefit of Nominal Defendant UHS against Defendants for their breaches of fiduciary duties, abuses of control, gross mismanagement, and other violations of law.

## JURISDICTION AND VENUE

1.  This Court has jurisdiction over this action pursuant to 28 U.S.C § 1331 (federal question jurisdiction) insofar as Plaintiff's claims arise under and are governed by the provisions of the Private Securities Litigation Reform Act, 15 U.S.C. § 78u-4(f), and pursuant to this Court's supplemental jurisdiction under 28 U.S.C. § 1367 as to claims arising under and governed by the common law.

2.  This action is not a collusive one designed to confer jurisdiction on a court of the United States which it would not otherwise have.

3.  Venue is proper in this District pursuant to 28 U.S.C. § 1391 (a)(1) because UHS's principal place of business is located within this District and many of the acts complained of, including the dissemination of false and misleading statements and reports prepared by or with the participation, acquiescence, encouragement, cooperation, or assistance of Defendants, occurred, at lease in part within this District..

## PARTIES

4.  Plaintiff, Eastside Investors, LLP, is a Florida limited liability partnership, and is currently, and has been at all relevant times a shareholder of record of UHS.

5.  Nominal Defendant UHS is a corporation organized and existing under the laws of the state of Delaware with its principal place of business located at 367 South Gulph Road, King of Prussia, PA 19406.

6.  Defendant Alan B. Miller ("Miller") was, at all relevant times, the Company's President, Chief Executive Officer, and Chairman of the Board. Miller is currently a member of UHS' Board of Directors, and has been a member since 1978.

7.    Defendant Robert H. Hotz ("Hotz") was at all relevant times, a Director of UHS, and has been a Board member since 1991.  Hotz is currently a member of the Board's Audit and Finance Committees.

8.    Defendant Anthony Pantaleoni ("Pantaleoni") was at all relevant times, a Director of UHS, and has been a Board member since 1982.  Pantaleoni is a member of the Board's Finance Committee.

9.    Defendant Steve G. Filton ("Filton") was, at all relevant times, the Company's Chief Financial Officer.

10.   Defendants Miller, Hotz, Pantaleoni and Filton are collectively referred to hereinafter as the "Defendants."  Each of the Defendants, as senior executive officers and/or directors of UHS, were privy to non-public information concerning its business, finances, products, markets and present and future business prospects via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board of Directors meetings and committees thereof and via reports and other information provided to them in connection therewith.

11.   Each of the Defendants are liable as a direct participant with respect to the wrongful acts and courses of conduct alleged herein and/or for allowing through bad faith breaches of fiduciary duty such wrongful conduct to occur.  In addition, by reason of their status as senior executive officers and directors, the Defendants had the power and influence to cause UHS to engage in unlawful conduct and/or to prevent same.

12.   The Defendants, because of their positions with UHS, had the responsibility to prevent the fraudulent acts alleged herein, and were responsible for the accuracy of public reports of UHS.

13.   As further alleged here UHS's current Board of Directors is unable to make an impartial determination as to whether to institute legal proceedings to redress the wrongful conduct alleged herein because there is a substantial likelihood that a majority of its members would be found liable for non-exculpated breaches of their fiduciary duties to the Company and shareholders by participating or acquiescing in the wrongdoing alleged herein and/or completely failing to perform their oversight duties to the Company, failing to oversee the Company's compliance with legally mandated accounting and disclosure standards and systemic failure to assure that a reasonable

3

information and reporting system existed. The current Board of Directors is also unable to make an impartial decision as to whether to institute legal proceedings to redress the wrongful conduct alleged herein because the Board is dominated by Defendant Miller, the founder of the Company and its largest shareholder owning 98.8% of Class A Common Shares, 98.5% of Class C Shares and 9.9% of Class B Shares, who personally made many of the material misrepresentations and omissions alleged herein. Moreover, of the six UHS directors, two—Miller and Pantaleoni—are acknowledged by UHS not be independent directors, while another director, John Williams, would not be able to independently consider bringing an action that would be to the detriment of Miller since Williams is University Provost of George Washington University, an institution which depends to a significant extent on the goodwill of Miller due to Miller's control over the partnership which owns and manages the crucial George Washington University Hospital. Finally, a majority of directors approved an employee retention program under which employees were granted loans which were forgiven if the employee remained with the company for a certain number of years. Under this program, the directors approved loans of $7.6 million in corporate funds to defendant Miller despite the fact that the odds of Miller leaving UHS were nil due to his control over the Company, and his ownership of approximately $250 million worth of UHS stock. The directors would have to have known that such a loan (which UHS has indeed forgiven) was nothing other than a giveaway of Company funds and a waste of corporate assets, which had no purpose other than to further enrich defendant Miller. That this wasteful transaction was approved, demonstrates the domination and control of Miller. For these reasons, and others detailed herein, a majority of directors are not independent.

14.     During the Relevant Period, the Defendants, as senior executive officers and/or Directors of UHS were privy to confidential and proprietary information concerning UHS, its operations, finances, financial condition, and present and future business prospects. The Defendants also had access to material adverse non-public information concerning UHS. Because of their possession of such information, the Defendants knew or consciously disregarded the fact that the material misrepresentations and omissions specified herein were being made to, had not been disclosed to, and were being concealed from the investing public.

15.     The Defendants, because of their positions with the Company, controlled and/or possessed the authority to control the contents of its reports, press releases, and presentations to securities analysts and through them to the shareholders and investing public.  The Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading, prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.

16.     As senior executive officers and/or directors of a publicly-traded company whose common stock was, and is, registered with the SEC pursuant to the Exchange Act, and which was traded on the NASDAQ and governed by the federal securities laws, the Defendants had a duty to disseminate promptly accurate and truthful information with respect to UHS's financial conditions and performance, growth, operations, financial statements, business, products, markets, management, earnings, and present and future business prospects, and to correct any previously issued statements that had become materially misleading or untrue, so that the market price of UHS's common stock would be based upon truthful and accurate information.

17.     As members of the Board of Directors of UHS, the Director Defendants were directly responsible for authorizing or permitting the authorization of, or failing to monitor, the practices which resulted in the violations of the federal securities laws as alleged herein.

18.     The Defendants, who constitute a majority of the Company's current Board of Directors, have a substantial likelihood of being held personally liable for the misconduct complained of herein.

### SUBSTANTIVE ALLEGATIONS

**Background**

19.     Universal Health, through its subsidiaries, owns and operates acute care hospitals, behavioral health centers, ambulatory surgery centers and radiation oncology centers.  Services provided by the Company's hospitals include:  general surgery, internal medicine, obstetrics, emergency room care, radiology, oncology, diagnostic care, coronary care, pediatric services and behavioral health services.

20.     As of December 31, 2002, the Company operated 34 acute care hospitals and 38 behavioral health centers.  The Company, as part of its ambulatory treatment centers division, owns outright, or in

partnership with physicians, and operates or manages 24 surgery and radiation oncology centers located in 12 states and Puerto Rico.

**Allegedly Materially False And Misleading**
**Statements Issued By the Defendants**

21.  UHS has been named a defendant in several securities fraud class actions due to the action, or omissions to act, of the Defendants named herein. The following paragraphs detail the allegations of those lawsuits: The Class Period commences on July 21, 2003.  At that time, UHS issued a press release announcing its financial results for the period ended June 30, 2003.  UHS reported that its net income and earnings per share (diluted) were $51.0 million and $.82 for the three-month period ended June 30, 2003, and $103.7 million and $1.66 for the six-month period ended June 30, 2003, respectively.  These results represented a 19% increase in earnings per share (diluted) both for the three-month and six-month periods ended June 30, 2003 over the comparable prior year periods. Revenues increased 12% to $903 million in the three-month period and also by 12% to $1.80 billion in the six-month period ended June 30, 2003.  As of June 30, 2003, the Company's balance sheet debt, net of cash, was $675 million and its shareholders' equity was $976 million.

22.  Additionally, the Company reported that managed care pricing remained strong in the quarter. Operating margins for the Company's acute care hospitals located in the U.S. and Puerto Rico owned in both the three-month periods ended June 30, 2003 and June 30, 2002, increased to 18.3% from 17.6%.  Operating margins for the Company's behavioral health hospitals owned in both periods increased to 23.8% during the second quarter of 2003 from 21.2% during the prior year's quarter. The Company's operating margin (as calculated on the attached schedules of Supplemental Consolidated Income Statement Information), increased to 16.7% in the three-month period ended June 30, 2003 as compared to 16.0% in the same period of the prior year.

23.  On August 13, 2003, the Company filed its quarterly report with the SEC on Form 10-Q.  The Company's Form 10-Q was signed by the Individual Defendants.  Therein, the Company reaffirmed its previously announced financial results and represented the following:

> The consolidated financial statements included herein have been prepared by the Company, without audit, pursuant to the rules and regulations of the Securities and Exchange Commission and reflect all normal and recurring adjustments which, in the opinion of the

6

Company, are necessary to fairly present results for the interim periods. Certain information and footnote disclosures normally included in financial statements prepared in accordance with generally accepted accounting principles have been condensed or omitted pursuant to such rules and regulations, although the Company believes that the accompanying disclosures are adequate to make the information presented not misleading.

\*\*\*

Management of the Company believes that operating income, which is a non-GAAP financial measure, is helpful to investors as a measure of the Company's operating performance. The Company defines operating income as net revenues less salaries, wages & benefits, other operating expenses, supplies expense and provision for doubtful accounts. Since the source of financing for the purchase of property and equipment and other assets at each hospital varies, the Company believes that measuring operating performance before capital-related costs (such as depreciation and amortization, lease and rental and interest expense) provides a useful comparison of relative operating performance among its facilities. Operating income and operating margin (which is also a non-GAAP financial measure and computed by dividing operating income by net revenues) are used by management as analytical indicators for purposes of assessing the relative operating performance of the Company's individual hospitals and operating segments, and the overall Company. In addition, the Company's use of operating income and operating margin enables investors to compare the performance of the Company with that of others in the industry. To obtain a complete understanding of the Company's financial performance, operating income and operating margin should be examined in connection with net income, determined in accordance with generally accepted accounting principles, as presented in the financial statements elsewhere in this Quarterly Report on Form 10-Q. Since the items excluded from operating income and the computation of operating margin are significant components in understanding and assessing financial performance under generally accepted accounting principles, these measures should not be considered to be an alternative to net income as a measure of the Company's operating performance or profitability. Because operating income and operating margin are not measurements determined in accordance with generally accepted accounting principles and are thus susceptible to varying calculations, operating income and operating margin as presented may not be comparable to other similarly titled measures of other companies. Investors are encouraged to use GAAP measures when evaluating the Company's financial performance.

Operating income (defined as net revenues less salaries, wages & benefits, other operating expenses, supplies expense and provision for doubtful accounts) increased 16% to $151 million for the three month period ended June 30, 2003 from $129 million in the comparable prior year quarter. Overall operating margins (defined as operating income divided by net revenues) were 16.7% and 16.0% during the three month periods ended June 30, 2003 and 2002, respectively. Operating income increased 15% to $300 million for the six month period ended June 30, 2003 from $261 million in the comparable prior year period. Overall operating margins were 16.7% and 16.2% during the six month periods ended June 30, 2003 and 2002, respectively. The increase in the overall operating margins during the three and six month periods of 2003, as compared to the comparable prior year periods, resulted primarily from a decrease in other operating expenses which decreased to 23.4% and 23.1% of net revenue during the three and six month periods ended June 30, 2003, respectively, as compared to 24.6% and 24.2% during the three and six month periods ended June 30, 2002, respectively. These decreases resulted primarily from decreased pharmacy costs resulting from a new outsourcing agreement, that commenced during the third quarter of 2002, covering the provision of pharmacy services for the Company's acute care facilities located in the U.S. and Puerto Rico.

24.    On October 20, 2003, UHS announced that its net income and earnings per share (diluted) were $47.4 million and $.76 for the three-month period ended September 30, 2003, and $151.1 million and $2.42 for the nine-month period ended September 30, 2003, respectively, after recording after tax, non-recurring gains on sales of $4.4 million or $.07 per share (diluted) and an after tax charge for the cumulative effect of a change in accounting principle of $1.7 million or $.03 per share (diluted).  Excluding the non-recurring gains and the cumulative change in accounting principle, earnings per share (diluted) for the three-month period ended September 30, 2003 were $.72, an 11% increase from the earnings recorded in the third quarter of 2002.  Revenues increased 10% to $896 million in the three-month period and by 11% to $2.69 billion in the nine-month period ended September 30, 2003.  As of September 30, 2003, the Company's balance sheet debt, net of cash, was $615 million and its shareholders' equity was $1.023 billion.

25.    Additionally, the Company stated that operating margins for the Company's acute care hospitals located in the U.S. and Puerto Rico owned in both the three-month periods ended September 30, 2003 and September 30, 2002, increased to 17.0% from 16.7%.  Operating margins for the

Company's behavioral health hospitals owned in both periods increased to 22.3% during the third quarter of 2003 from 19.2% during the prior year quarter.  The Company's operating margin (as calculated on the attached schedules of Supplemental Consolidated Income Statement Information), increased to 15.4% in the three-month period ended September 30, 2003, as compared to 15.3% in the same period of the prior year.

26. On November 10, 2003, the Company filed its quarterly report with the SEC on Form 10-Q.  The Company's Form 10-Q was signed by the Individual Defendants.  Therein, the Company reaffirmed its previously announced financial results and represented the following:

> The consolidated financial statements included herein have been prepared by the Company, without audit, pursuant to the rules and regulations of the Securities and Exchange Commission and reflect all normal and recurring adjustments which, in the opinion of the Company, are necessary to fairly present results for the interim periods. Certain information and footnote disclosures normally included in financial statements prepared in accordance with generally accepted accounting principles have been condensed or omitted pursuant to such rules and regulations, although the Company believes that the accompanying disclosures are adequate to make the information presented not misleading.
>
> ***
>
> Management of the Company believes that operating income, a non-GAAP financial measure as defined above, is helpful to investors as measures of the Company's operating performance. Since the source of financing for the purchase of property and equipment and other assets at each hospital varies, the Company believes that measuring operating performance before capital-related costs (such as depreciation and amortization, lease and rental and interest expense) provides a useful comparison of relative operating performance among its facilities. Operating income is used by management as an analytical indicator for purposes of assessing the relative operating performance of the Company's individual hospitals and operating segments, and the overall Company. In addition, the Company's use of operating income enables investors to compare the performance of the Company with that of others in the industry. To obtain a complete understanding of the Company's financial performance, operating income should be examined in connection with net income, determined in accordance with generally accepted accounting principles, as presented in the financial statements elsewhere in this Quarterly Report on Form 10-Q. Since the items excluded from operating income are significant components in

understanding and assessing financial performance under generally accepted accounting principles, these measures should not be considered to be an alternative to net income as a measure of the Company's operating performance or profitability. Because operating income is not a measurement determined in accordance with generally accepted accounting principles and is therefore susceptible to varying calculations, operating income as presented may not be comparable to other similarly titled measures of other companies. Investors are encouraged to use GAAP measures when evaluating the Company's financial performance.

Operating income increased 11% to $138 million for the three month period ended September 30, 2003 from $125 million in the comparable prior year quarter. Overall operating margins were 15.4% and 15.3% during the three month periods ended September 30, 2003 and 2002, respectively. The slight increase in the overall operating margin during the three month period ended September 30, 2003, as compared to the comparable prior year period, resulted from a decrease in the provision for doubtful accounts to 6.9% of net revenues during the third quarter of 2003 as compared to 7.7% in the comparable prior year quarter, partially offset by an increase in salaries, wages and benefits to 40.4% of net revenues during the 2003 third quarter as compared to 39.8% in the comparable prior year quarter. Contributing to the increase in salaries, wages and benefits during the third quarter of 2003 as compared to the comparable prior year quarter was an increase of .4% of net revenues in employee benefit expense.

27. On January 29, 2004, UHS stated that it expected to report earnings per diluted share of $.75 for the fourth quarter ended December 31, 2003 and $3.20 for the year ended December 31, 2003 and adjusted earnings per diluted share of $.73 for its fourth quarter ended December 31, 2003 and $3.11 for the year ended December 31, 2003.  Included in the expected reported earnings per diluted share for the fourth quarter ended December 31, 2003 was: (i) a previously disclosed increase of $.08 per diluted share resulting from the reversal of an accrued liability (including accrued interest) due to a favorable Texas Supreme Court decision which reversed an unfavorable 2000 jury verdict and 2001 appellate court decision; (ii) an increase of $.07 per diluted share resulting from a gain realized on the disposition of an investment in a health care related company, and; (iii) a reduction of $.13 per diluted share resulting from the write-down of the carrying value of an acute care pediatric hospital located in Puerto Rico to its estimated net realizable value. Included in the expected reported earnings per diluted share for the year ended December 31, 2003, in addition to the fourth quarter

items mentioned above, were previously disclosed gains totaling $.07 per diluted share realized on the sales of radiation therapy centers, medical office buildings and an outpatient surgery center all of which were sold during the third quarter ended September 30, 2003.  The Company further stated that it anticipated net revenues for 2004 to exceed $4.2 billion and earnings per diluted share of $3.43 to $3.53.

28.     On February 18, 2004, UHS announced its results for the fourth quarter and full year ended December 31, 2003.  The Company reported that net income was $46.5 million or $.75 per diluted share during the fourth quarter of 2003, as compared to $43.9 million or $.69 per diluted share during the fourth quarter of 2002. For the full year of 2003, reported net income was $199.3 million or $3.20 per diluted share as compared to $175.4 million or $2.74 per diluted share during 2002. Included in the reported results for the fourth quarter ended December 31, 2003 were the items listed in ¶ 31.  Included in the reported results for the year ended December 31, 2003, in addition to the fourth quarter items mentioned above, were previously disclosed after-tax (and after-minority interest) gains amounting to $4.4 million or $.07 per diluted share realized on the sales of radiation therapy centers, medical office buildings and an outpatient surgery center, all of which were sold during the third quarter ended September 30, 2003.  Excluding the items listed in ¶ 31 from the three month period ended December 31, 2003 and excluding an after-tax recovery of closure costs of $1.4 million or $.02 per diluted share included in the three month period ended December 31, 2002, adjusted net income and adjusted earnings per diluted share (both as calculated on the attached Schedule of Consolidated Income Statement Information) increased 6% to $45.3 million and 9% to $.73, respectively, during the fourth quarter of 2003 as compared to $42.5 million and $.67, respectively, in the prior year quarter. Net revenues increased 14% during the three month period ended December 31, 2003 to $949.5 million as compared to $835.5 million during the prior year's fourth quarter. During the quarter ended December 31, 2003, EBITDA (as calculated on the attached schedule of Supplemental Consolidated Income Statement Information) increased 10% to $121.5 million as compared to $110.7 million during the prior year's fourth quarter.

29.     The Company also reported that for the year ended December 31, 2003, adjusted net income and adjusted earnings per diluted share increased 11% and 14%, respectively, to $193.7 million and

$3.11 as compared to $174.0 million and $2.72, respectively, during 2002. During 2003, net revenues increased 12% to $3.64 billion as compared to $3.26 billion during 2002. EBITDA increased 13% during 2003 to $490.7 million as compared to $434.6 million during 2002.

30.     Commenting on these results, defendant Miller stated:

> "Our hospitals owe their success to a responsive management style, and to a service philosophy that is based on integrity, competence and compassion. The UHS strategy is to build or purchase health care properties in rapidly growing markets, and then create a strong franchise based on exceptional service and effective cost control. The efforts of the many talented people at UHS produced solid financial results even though hospitals continue to be challenged by sluggish volumes. In addition to continuing to invest aggressively to provide the health care needed by our existing communities, UHS will also continue to look selectively to acquire hospitals where we believe our skills can improve the quality and financial viability of the hospital."

31.     UHS further stated that The Company's provision for doubtful accounts was 7.8% of net revenues during the fourth quarter of 2003 as compared to 6.9% during the prior year's fourth quarter. The increase resulted primarily from an increase in uninsured and self-pay patients which unfavorably impacts the collectibility of our patient accounts. Moreover, the Company expected this trend to continue until there is a notable strengthening of the labor market.

32.     The statements contained in ¶¶ 25-31 are alleged in the class action lawsuits to have been each materially false and misleading because the defendants failed to disclose and indicate: (1) that the Company was facing heightened competition in certain markets such as McAllen, Texas, Las Vegas, Nevada, and Aiken, South Carolina and that this competition was eroding from the Company's market share; (2) that Universal Health's payor mix was deteriorating because the Company was starting to see a rise in admittance to its hospitals of self-pay and uninsured patients; (3) that due to the rise in self-pay and uninsured patients, the Company's bad debt expense ratio rose to unfathomable levels; (4) that the length of stay on Medicare cases at Universal Health facilities was increasing due to poor case management discipline; (5) that the Company failed to write-off uncollectible receivables; (6) by failing to write-off uncollectible receivables, Universal Health materially overstated its financial results; (7) that the Company's allowance for doubtful accounts

was insufficient, thereby causing the Company to materially overstate its operating income; and (8) that as a result of this failure, the Company's reported operating income did not serve as a true measure of its operating performance.

**The Truth Begins to Emerge**

33.     On March 1, 2004, the Company announced that its earnings per diluted share for the three-month period ending March 31, 2004, could be as much as 25% lower than the $.84 per diluted share recorded in the same period in the prior year.  On a same facility basis, the Company's acute care hospitals had continued, in the first two months of 2004, to experience a decline in inpatient admissions.  Moreover, during this period, certain of the Company's acute care facilities had been impacted by a negative shift in payor mix, a decline in intensity and an increase in length of stay.  In addition, the rising level of uninsured and self-pay patients continued to unfavorably impact our bad debt expense.

34.     News of this shocked the market.  Shares of UHS fell $9.05 per share, or 16.78%, to close at $44.88 per share on March 1, 2004.

## UNIVERSAL HEALTH'S VIOLATIONS OF GAAP RULES

35.     During the Class Period, Defendants herein caused the Company announced financial results that were allegedly in violation of GAAP, the Company's own announced revenue recognition policies, and the following principles:

        a.      The principle that "interim financial reporting should be based upon the same accounting principles and practices used to prepare annual financial statements" was violated (APB No. 28, ¶10);

        b.      The principle that "financial reporting should provide information that is useful to present to potential investors and creditors and other users in making rational investment, credit, and similar decisions" was violated (FASB Statement of Concepts No. 1, ¶34);

        c.      The principle that "financial reporting should provide information about the economic resources of an enterprise, the claims to those resources, and effects of transactions, events, and circumstances that change resources and claims to those resources" was violated (FASB Statement of Concepts No. 1, ¶40);

      d.     The principle that "financial reporting should provide information about an enterprise's financial performance during a period" was violated  (FASB Statement of Concepts No. 1, ¶42);

      e.     The principle that "completeness, meaning that nothing is left out of the information that may be necessary to insure that it validly represents underlying events and conditions" was violated (FASB Statement of Concepts No. 2, ¶79);

      f.     The principle that "financial reporting should be reliable in that it represents what it purports to represent" was violated  (FASB Statement of Concepts No. 2, ¶¶58-59); and

      g.     The principle that "conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered" was violated.  (FASB Statement of Concepts No. 2, ¶95).

36.    The adverse information concealed by Defendants during the Class Period and detailed above was in violation of Item 303 of Regulation S-K under the federal securities law (17 C.F.R. 229.303).

37.    To the extent the Company was caused by the Defendants acts or omissions to violate the securities law, they are liable for any damages caused thereby, and must reimburse the Company for the harm it has incurred and will continue to incur, including legal and accounting costs, and the costs of defending and settling any securities fraud class actions and/or any verdict rendered against it.  In addition, UHS is entitled to recover any profits any of the defendants realized from sales of UHS shares while in possession of material, non-public information.  Finally, Defendants are liable to UHS for damages suffered by the Company due to poor case management, and mishandling of growing bad debts.

## DEMAND EXCUSED ALLEGATIONS

38.    Plaintiff is an owner of UHS common stock and was an owner of UHS common stock during the time period relevant of the Defendants' wrongful course of conduct alleged herein through the present.

39.    UHS' Board of Directors is currently composed of six (6) directors - Leatrice Ducat, John H. Herrell, Robert H. Hotz, Alan B. Miller, John F. Williams, Jr. and Anthony Pantaleoni.  Miller, Hotz and Pantaleoni have been named as Defendants herein.

40.    Defendant Miller, as a director, owed a duty to UHS and its shareholders to be reasonably informed about the business and operations of the Company. As CEO, President and Chairman of the Board, Miller also assumed important managerial responsibilities which required him to be well informed about the day-to-day operations of the Company. However, Miller breached these duties by actively participating in, encouraging, sponsoring, and/or approving many of the wrongful acts or omissions complained of herein and/or purposefully or recklessly disregarding these wrongful acts or omissions. UHS' Board of Directors is dominated by Miller, the founder of the Company and with his wife, and family foundation largest shareholder controlling 83.8% of the voting power of the Company and thereby effectively controlling the direction of the Company,   including the composition of the Company's Board of Directors and the retention of its members.

41.    Defendant Hotz, as a director, owed a duty to UHS and its shareholders to be reasonably informed about the business and operations of the Company.  As a member of the Audit Committee, Hotz also assumed important managerial responsibilities which required him to be well informed about the day-to-day operations of the Company, and he had a duty to ensure that UHS's internal accounting procedures and controls and the Company's financial statement complied with GAAP.  However, Hotz breached these duties by actively participating in, encouraging, sponsoring, and/or approving many of the wrongful acts or omissions complained of herein and/or purposefully recklessly disregarded these wrongful acts or omissions.  Hotz owns directly or beneficially 30,000 of the Company's Common Shares.

42.    Defendant Pantaleoni, as a director, owed a duty to UHS and its shareholders to be reasonably informed about the business and operations of the Company.  Pantaleoni breached these duties by actively participating in, encouraging, sponsoring, and/or approving many of the wrongful acts or omissions complained of herein and/or purposefully or recklessly disregarding these wrongful acts or omissions.  Pantaleoni is employed as an attorneys at Fulbright & Jaworski, LLP.  This lawfirm is the principal outside counsel for UHS.  Moreover, Fulbright & Jaworski, LLP also provides personal legal services to defendant Miller.

43.    Defendant Filton, as CFO, owed a duty to UHS and its shareholders to be reasonably informed about the business and operations of the Company.  He also assumed important managerial responsibilities

which required him to be well about the day-to-day operations of the Company.  As CFO, he had a duty to ensure that UHS's internal accounting procedures and controls and the Company's financial statements complied with GAAP.  Instead, Filton breached these duties by actively participating in, encouraging, sponsoring, and/or purposefully or recklessly disregarding these wrongful acts or omissions.  Filton is a direct participant in the wrongdoing complained of herein because, as CFO, he was directly responsible for approving the Company's financial statements.  Filton owns 111,490 Shares of the Company's common stock.

44.     Demand on the UHS Board of Directors to institute this action is not necessary because such a demand would be a futile and useless act.  Particularly for the additional following reasons:

     a.     A majority of the directors of UHS, as detailed herein, participated in, approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from UHS stockholders and investors and are, therefore, not disinterested parties and many are the principal beneficiaries of the wrongdoing alleged herein, and thus could not fairly and fully prosecute such a suit even if such suit was instituted by them;

     b.     The Defendant Directors including Miller, Hotz, Pantaleoni and Filton own a majority of the common stock of the Company and control its direction and the composition of its Board of Directors.  Defendant Miller controls 83.8% of the voting power of the Company and effectively controls and directs the Company himself, including the composition of the Company's Board of Directors.  The Board is dominated by Miller.  Miller's dominance over the Board and the control and direction of the Company is evidenced by, among other things, his total control of the voting power.

     c.     A majority of the Directors had a responsibility and obligation to assure that all press releases and filings of SEC reports, including all financial reports, were accurate and that all financial controls and other oversight procedures were in place that would have detected and prevented that false and misleading statements put out by the Company to the public that are further described in this Complaint;

d.      In order to bring this suit, a majority of the directors of UHS would be forced to sue themselves and/or persons with whom they have extensive business and personal entanglements, which they will not do, thereby excusing demand;

e.      The acts complained of constitute violations of state law and the fiduciary duties owed by UHS officers and directors and are incapable of ratification;

f.      The actions of the Directors had impaired the Board's ability to validly exercise its business judgment and rendered it incapable of reaching an independent decision as to whether to accept Plaintiff' demands;

g.      Defendants Miller and Filton are currently defendants in a number of securities class action lawsuits arising out of the wrongdoing alleged herein and a suit by the Defendant Directors of UHS to remedy the wrongs alleged herein would likely expose the Director Defendants and UHS to further violations of securities law which would result in additional civil actions being filed against one or more of the Director Defendants; thus they are hopelessly conflicted in making any supposedly independent determination as to whether to sue themselves;

h.      UHS has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein; yet, the Director Defendants have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct which caused the filing of securities class actions against UHS, nor have they attempted to recover any part of the damages UHS suffered and will suffer thereby or the illegal insider trading process reaped by Defendant Pantaleoni;

i.      If the Defendant Directors were to bring this derivative action against themselves, they would thereby expose their own negligence and misconduct which underlies allegations against the Company contained in the class action complaints for violations of federal securities law.  Such admissions would impair the Company's and their defense of the Class Actions and greatly increase the probability of their personal liability in the Class Actions in an amount likely to be in excess of any insurance coverage available to the Director Defendants'

17

j.      The Director Defendants are believed to be covered by an insurance policy which covers the type of misconduct alleged herein, which policy would likely preclude coverage, if any, if the Director Defendants initiated action against any of the other Director Defendants named herein.   Therefore, the UHS Board, or any committee thereof, is effectively disabled from complying with any demand that would cause the company to bring suit against the Defendants because to do so would result in the loss of their insurance coverage.

k.      Moreover, of the six UHS directors, two—Miller and Pantaleoni—are acknowledged by UHS not be independent directors, while another director, John Williams, would not be able to independently consider bringing an action that would be to the detriment of Miller since Williams is University Provost of George Washington University, an institution which depends to a significant extent on the goodwill of Miller due to Miller's control over the partnership which owns and manages the crucial George Washington University Hospital. Finally, a majority of directors approved an employee retention program under which employees were granted loans which were forgiven if the employee remained with the company for a certain number of years. Under this program, the directors approved loans of $7.6 million in corporate funds to defendant Miller despite the fact that the odds of Miller leaving UHS were nil due to his control over the Company, and his ownership of approximately $250 million worth of UHS stock.   The directors would have to have known that such a loan (which UHS has indeed forgiven) was nothing other than a giveaway of Company funds and a waste of corporate assets, which had no purpose other than to further enrich defendant Miller.   That this wasteful transaction was approved, demonstrates the domination and control of Miller. For these reasons, and others detailed herein, a majority of directors are not independent.

l.      During the Relevant Period, a majority of directors, while in possession of material non-public information, sold shares.  Defendant Miller disposed of 102,587 shares of his own stock for proceeds totaling $5,181,245.  Further, defendant Filton sold 4,077 shares of his own stock for proceeds totaling $195,002.  Additionaly, defendant Hotz sold 10,000 shares

of his own stock for proceeds totalling $537,500.00.  Moreover, defendant Pantaleoni sold 2,000 shares of his own for proceeds totalling 197,500 during the relevant period.

45.    Plaintiff has not made any demand on the shareholders of UHS to institute this action since such demand would be a futile and useless act for the following reasons:

   a.    UHS is a publicly traded company with thousands of shareholders;

   b.    Making demand on such a number of shareholders would be impossible for Plaintiff, who has no way of finding out the names, addresses or telephone numbers of shareholders; and

   c.    Making demand on all shareholders would force Plaintiff to incur huge expenses, assuming all shareholders could even be individually identified.

46.    Plaintiff will adequately and fairly represent the interests of UHS in enforcing and prosecuting its rights.

**CAUSES OF ACTION**

**Count I**
**Against Defendants for Breach of Fiduciary Duty**

47.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

48.    The Defendants owed and owe UHS fiduciary obligations.   By reason of their fiduciary relationships, the Defendants owed and owe UHS the highest obligations of good faith, fair dealing, loyalty and due care.

49.    The Defendants breached their fiduciary duties of care, loyalty, reasonable inquire, oversight, good faith and supervision.

50.    Each of the Defendants had actual or constructive knowledge that they had caused UHS to improperly misrepresent the financial results of the Company and failed to correct publicly reported financial results and guidance.  These actions could not have been a good faith exercise of prudent business judgment.

51.    As a direct and proximate result of the Defendants' misconduct, UHS has suffered and will continue to suffer significant damages.  As a result of the misconduct alleged herein, the Defendants are liable to the Company.

52.    Plaintiff, on behalf of UHS, has no adequate remedy at law.

## Count II
## <u>Against Defendants for Abuse of Control</u>

53.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as if though fully set forth herein.

54.    The Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence UHS, for which they are legally responsible.  Moreover, defendants Miller, Hotz and Pantaleoni sold shares during the class period alleged in the securities class action while in possession of material, non-public information, and are required to disgorge to the Company all profits received thereby.

55.    As a direct and proximate result of the Defendants' abuse of control, UHS has sustained significant damages, and Defendants are liable to the Company.

## Count III
## <u>Against Defendants for Gross Mismanagement</u>

56.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as if though fully set forth herein.

57.    By their actions alleged herein, the Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of UHS in a manner consistent with the operations of a publicly held corporation.

58.    As a direct and proximate result of the Individual Defendants' gross mismanagement, UHS has sustained significant damages, and Individual Defendants are liable to the Company.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for judgment as follows:

A.      Against all of the Defendants for the damages sustained by UHS as a result of the

breaches of fiduciary duty, abuse of control, gross mismanagement, waste of corporate assets

and unjust enrichment;

B.      Equitable and/or injunctive relief as permitted by law;

C.      Restitution and disgorgement of profits;

D.      Attorneys fees and Costs; and

E.      Any such other and further relief as may be just and proper.


Plaintiff demands a trial by jury.


Dated: _____, 2004

                                                        Respectfully submitted,


                                                        _____
                                                        Brian M. Felgoise, Esquire
                                                        Law Offices of Brian M. Felgoise, P.C.
                                                        261 Old York Road - Suite 423
                                                        Jenkintown, PA 19046
                                                        (215) 886-1900
                                                                 - and –
                                                        Laurence D. Paskowitz, Esquire
                                                        Paskowitz & Associates
                                                        60 East 42nd Street - 46th Floor
                                                        New York, NY 10165
                                                        (212) 685-0969
                                                                 - and -
                                                        Richard B. Brualdi, Esquire
                                                        The Brualdi Law Firm
                                                        29 Broadway
                                                        New York, NY 10006
                                                        (212) 952-0602


                                                        *Attorneys for Plaintiff*