## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| EASTSIDE INVESTORS, LLP, derivatively on Behalf of Nominal Defendant UNIVERSAL HEALTH SERVICES, INC., | ) ) ) ) | **CIVIL ACTION NO.:** **04-CV-2626** |
| Plaintiff, | ) ) | |
| vs. | ) ) ) | |
| ALAN B. MILLER, and STEVE G. FILTON | ) ) | **JURY TRIAL DEMANDED** |
| Defendants, | ) ) ) | |
| and | ) ) | |
| UNIVERSAL HEALTH SERVICES, INC. | ) ) ) | |
| Nominal Defendant. | ) ) | |

### PLAINTIFF'S FIRST AMENDED DERIVATIVE COMPLAINT

Plaintiff Eastside Investors, LLP ("Eastside" or "Plaintiff"), derivatively on behalf of Nominal Defendant Universal Health Services, Inc. ("UHS" or the "Company") for its complaint against Defendants, alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation of counsel, which included, among other things, a review of UHS's public documents, announcements, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and concerning UHS and information readily available on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

This is a shareholder's derivative action brought in the right and for the benefit of Nominal Defendant UHS against Defendants for contribution pursuant to the Federal securities laws, for breach of fiduciary duty, mismanagement, unjust enrichment and other violations of law.

## JURISDICTION AND VENUE

1.      This Court has jurisdiction over this action pursuant to 28 U.S.C. §1332(a)(2) in that Plaintiff and Defendants are citizens of different states and the matter in controversy exceeds $75,00.00, exclusive of interest and costs.  Further, this Court has jurisdiction over this action pursuant to 28 U.S.C § 1331 (federal question jurisdiction) insofar as this action arises under both Section 10(b) of  the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j(b), pursuant to which there is a private right of action for contribution, and Section 21D of the Private Securities Litigation Reform Act, 15 U.S.C. § 78u-4, which governs the application of any private right of action for contribution asserted pursuant to the Exchange Act.  Prior to Congress having enacted an express provision for contribution under Section 21D of the Exchange Act, the United States Supreme Court recognized that a federal cause of action existed for contribution pursuant to Section 10(b) of the Exchange Act and Rule 10b-5.  *See Musick, Peeler & Garrnett v. Employers Insurance of Wausau*, 508 U.S. 286 (1993)  Thus, pursuant to federal statutory law and Supreme Court authority, this Court has original federal question jurisdiction over the Federal contribution claim alleged herein.  This Court also has subject matter jurisdiction over the pendant state law claims asserted herein pursuant to 28 U.S.C. § 1367 (supplemental jurisdiction), since this statute provides that the district court has supplemental jurisdiction over all other claims where, as here, they are so related to claims in the

action within the original jurisdiction of the Court, that they form part of the same case or controversy.

2.     This action is not a collusive one designed to confer jurisdiction on a court of the United States which it would not otherwise have.

3.     Venue is proper in the District because a substantial portion of the transactions and wrongs complained of herein, including Defendants, Alan B. Miller and Steve G. Filton ("Defendants") participation in the wrongful acts detailed herein, occurred in this District. Defendants, either reside in, or maintain executive offices or participate in board meetings in this District, and have received substantial compensation in this district by engaging in numerous activities and conducting business here, which had an effect in this district.

## PARTIES

4.     Plaintiff Eastside Investors, LLP, is a Florida limited liability partnership, and is currently, and has been at all relevant times a shareholder of UHS.  The limited liability partnership is comprised of four individuals, two reside in New York and two reside in Florida.

5.     Nominal Defendant UHS is a corporation organized and existing under the laws of the state of Delaware with its principal place of business located at 367 South Gulph Road, King of Prussia, PA 19406.

6.     Defendant Alan B. Miller ("Miller") was, at all relevant times, the Company's President, Chief Executive Officer, and Chairman of the Board. Defendant Miller is currently a member of UHS' Board of Directors, and has been a member since 1978.

7.     Defendant Steve G. Filton ("Filton") was, at all relevant times, the Company's Senior Vice-president and Chief Financial Officer.

3

8.     Defendants Miller and Filton are collectively referred to hereinafter as the "Individual Defendants."  Each of the Individual Defendants, as senior executive officers and/or director of UHS, were privy to non-public information concerning its business, finances, products, markets and present and future business prospects via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board of Directors meetings and committees thereof and via reports and other information provided to them in connection therewith.

9.     Each of the Individual Defendants are liable as a direct participant with respect to the wrongful acts and courses of conduct alleged herein and/or for allowing through bad faith breaches of fiduciary duty such wrongful conduct to occur.  In addition, by reason of their status as senior executive officers and directors, the Individual Defendants had the power and influence to cause UHS to engage in unlawful conduct and/or to prevent same.

10.     The Individual Defendants, because of their positions with UHS, had the responsibility to prevent the fraudulent acts alleged herein, and were responsible for the accuracy of public reports of UHS.

11.     UHS's current Board of Directors is unable to make an impartial determination as to whether to institute legal proceedings to redress the wrongful conduct alleged herein because :

a.     there is a substantial likelihood that a majority of its members could be found liable for non-exculpated breaches of their fiduciary duties to the Company and shareholders by participating or acquiescing in the wrongdoing alleged herein and/or completely failing to perform their oversight duties to the Company, failing to oversee the Company's compliance with legally mandated accounting and disclosure standards and systemic failure to assure that a reasonable information and reporting system existed;

b.     The current Board of Directors is also unable to make an impartial decision as to whether to institute legal proceedings to redress the wrongful conduct alleged herein because the Board is dominated by Defendant Miller, the founder of the Company and its largest shareholder  who owns 98.8 percent of Class A Common Shares, 98.5 percent  of Class C Shares and 9.9 percent of Class B Shares, and who personally made many of the material misrepresentations and omissions alleged herein.

c.     Of the six UHS directors, defendant Miller is acknowledged by UHS not to be independent directors.  Director John Williams, would not be able to independently consider bringing an action that would be to the detriment of defendant Miller, since director Williams is University Provost of George Washington University, an institution which depends to a significant extent on the goodwill of defendant Miller due to defendant Miller's control over the partnership which owns and manages the crucial George Washington University Hospital;

d.     A majority of directors approved an employee retention program under which employees were granted loans which were forgiven if the employee remained with the company for a certain number of years.  Under this program, the directors approved loans of $7.6 million in corporate funds to defendant Miller despite the fact that the likelihood of defendant Miller leaving UHS were nil due to his control over the Company, and his ownership of approximately $250 million worth of UHS stock.  The directors would have to have known that such a loan (which UHS has indeed forgiven) was nothing other than a giveaway of Company funds and a waste of corporate assets, which had no purpose other than to further enrich defendant Miller.  That this wasteful transaction was approved demonstrates the domination and control of the UHS Board by Miller. For these reasons, and others detailed in this Complaint, a majority of UHS directors are not independent, and could not fairly consider a pre-suit demand;

e.     As members of the Board of Directors of UHS, the Director Defendants were directly responsible for authorizing or permitting the authorization of, or failing to monitor, the practices which resulted in the violations of the federal securities laws as alleged herein. The Defendants, have a substantial likelihood of being held personally liable for the misconduct complained of herein, and are disabled from fairly considering a pre-suit demand; and

f.     A majority of the UHS Directors are not independent. While in possession of material non-public information, many sold UHS shares.  Defendant Miller disposed of 102,587 shares of his own stock for proceeds totaling $5,181,245. These sales of UHS stock raise reasonable doubt as to the Board's disinterestedness, as the sales raise serious questions as to the propriety of the director's own conduct and their own liability for wrongdoing.  Since there is not a majority of the UHS Board which could fairly consider a pre-suit demand herein, demand is excused.

12.     During the time period relevant herein, the Individual Defendants, as senior executive officers and/or Directors of UHS were privy to confidential and proprietary information concerning UHS, its operations, finances, financial condition, and present and future business prospects.  The Individual Defendants also had access to material adverse non-public information concerning UHS.  Because of their possession of such information, the Individual Defendants knew or consciously disregarded the fact that the material misrepresentations and omissions specified herein were being made to, had not been disclosed to, and were being concealed from the investing public.

13.     The Individual Defendants, because of their positions with the Company, controlled and/or possessed the authority to control the contents of its reports, press releases, and presentations to securities analysts and through them to the shareholders and investing public.

The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading, prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.

14.     As senior executive officers and/or directors of a publicly-traded company whose common stock was, and is, registered with the SEC pursuant to the Exchange Act, and which was traded on the NASDAQ and governed by the federal securities laws, the Individual Defendants had a duty to disseminate promptly accurate and truthful information with respect to UHS's financial conditions and performance, growth, operations, financial statements, business, products, markets, management, earnings, and present and future business prospects, and to correct any previously issued statements that had become materially misleading or untrue, so that the market price of UHS's common stock would be based upon truthful and accurate information.

## SUBSTANTIVE ALLEGATIONS

### Background

15.     Universal Health, through its subsidiaries, owns and operates acute care hospitals, behavioral health centers, ambulatory surgery centers and radiation oncology centers.  Services provided by the Company's hospitals include:  general surgery, internal medicine, obstetrics, emergency room care, radiology, oncology, diagnostic care, coronary care, pediatric services and behavioral health services.

16.     As of December 31, 2002, the Company operated 34 acute care hospitals and 38 behavioral health centers.  The Company, as part of its ambulatory treatment centers division, owns outright, or in partnership with physicians, and operates or manages 24 surgery and radiation oncology centers located in 12 states and Puerto Rico.

**Allegedly Materially False And Misleading**
**Statements Issued By the Defendants**

17.     UHS has been named a defendant in several securities fraud class actions due to the conduct of the Individual Defendants named herein. The following paragraphs detail the allegations of those lawsuits: The Class Period commences on July 21, 2003.  At that time, UHS issued a press release announcing its financial results for the period ended June 30, 2003, UHS reported that its net income and earnings per share (diluted) were $51.0 million and $.82 for the three-month period ended June 30, 2003, and $103.7 million and $1.66 for the six-month period ended June 30, 2003, respectively.   These results represented a 19% increase in earnings per share (diluted) both for the three-month and six-month periods ended June 30, 2003 over the comparable prior year periods.   Revenues increased 12% to $903 million in the three-month period and also by 12% to $1.80 billion in the six-month period ended June 30, 2003.  As of June 30, 2003, the Company's balance sheet debt, net of cash, was $675 million and its shareholders' equity was $976 million.

18.     Additionally, the Company reported that managed care pricing remained strong in the quarter.  Operating margins for the Company's acute care hospitals located in the U.S. and Puerto Rico owned in both the three-month periods ended June 30, 2003, and June 30, 2002, increased to 18.3% from 17.6%.   Operating margins for the Company's behavioral health hospitals owned in both periods increased to 23.8% during the second quarter of 2003 from 21.2% during the prior year's quarter.  The Company's operating margin increased to 16.7% in the three-month period ended June 30, 2003 as compared to 16.0% in the same period of the prior year.

19.    On August 13, 2003, the Company filed its quarterly report with the SEC on

Form 10-Q.  The Company's Form 10-Q was signed by the Individual Defendants.  Therein, the

Company reaffirmed its previously announced financial results and represented the following:

> The consolidated financial statements included herein have been
> prepared by the Company, without audit, pursuant to the rules and
> regulations of the Securities and Exchange Commission and reflect
> all normal and recurring adjustments which, in the opinion of the
> Company, are necessary to fairly present results for the interim
> periods. Certain information and footnote disclosures normally
> included in financial statements prepared in accordance with
> generally accepted accounting principles have been condensed or
> omitted pursuant to such rules and regulations, although the
> Company believes that the accompanying disclosures are adequate
> to make the information presented not misleading.
>
> ***
>
> Management of the Company believes that operating income,
> which is a non-GAAP financial measure, is helpful to investors as
> a measure of the Company's operating performance. The Company
> defines operating income as net revenues less salaries, wages &
> benefits, other operating expenses, supplies expense and provision
> for doubtful accounts. Since the source of financing for the
> purchase of property and equipment and other assets at each
> hospital varies, the Company believes that measuring operating
> performance before capital-related costs (such as depreciation and
> amortization, lease and rental and interest expense) provides a
> useful comparison of relative operating performance among its
> facilities. Operating income and operating margin (which is also a
> non-GAAP financial measure and computed by dividing operating
> income by net revenues) are used by management as analytical
> indicators for purposes of assessing the relative operating
> performance of the Company's individual hospitals and operating
> segments, and the overall Company. In addition, the Company's
> use of operating income and operating margin enables investors to
> compare the performance of the Company with that of others in the
> industry. To obtain a complete understanding of the Company's
> financial performance, operating income and operating margin
> should be examined in connection with net income, determined in
> accordance with generally accepted accounting principles, as
> presented in the financial statements elsewhere in this Quarterly
> Report on Form 10-Q. Since the items excluded from operating
> income and the computation of operating margin are significant

components in understanding and assessing financial performance under generally accepted accounting principles, these measures should not be considered to be an alternative to net income as a measure of the Company's operating performance or profitability. Because operating income and operating margin are not measurements determined in accordance with generally accepted accounting principles and are thus susceptible to varying calculations, operating income and operating margin as presented may not be comparable to other similarly titled measures of other companies. Investors are encouraged to use GAAP measures when evaluating the Company's financial performance.

Operating income (defined as net revenues less salaries, wages & benefits, other operating expenses, supplies expense and provision for doubtful accounts) increased 16% to $151 million for the three month period ended June 30, 2003 from $129 million in the comparable prior year quarter. Overall operating margins (defined as operating income divided by net revenues) were 16.7% and 16.0% during the three month periods ended June 30, 2003 and 2002, respectively. Operating income increased 15% to $300 million for the six month period ended June 30, 2003 from $261 million in the comparable prior year period. Overall operating margins were 16.7% and 16.2% during the six month periods ended June 30, 2003 and 2002, respectively. The increase in the overall operating margins during the three and six month periods of 2003, as compared to the comparable prior year periods, resulted primarily from a decrease in other operating expenses which decreased to 23.4% and 23.1% of net revenue during the three and six month periods ended June 30, 2003, respectively, as compared to 24.6% and 24.2% during the three and six month periods ended June 30, 2002, respectively. These decreases resulted primarily from decreased pharmacy costs resulting from a new outsourcing agreement, that commenced during the third quarter of 2002, covering the provision of pharmacy services for the Company's acute care facilities located in the U.S. and Puerto Rico.

20.     On October 20, 2003, UHS announced that its net income and earnings per share (diluted) were $47.4 million and $.76 for the three-month period ended September 30, 2003, and $151.1 million and $2.42 for the nine-month period ended September 30, 2003, respectively, after recording after tax, non-recurring gains on sales of $4.4 million or $.07 per share (diluted) and an after tax charge for the cumulative effect of a change in accounting principle of $1.7

million or $.03 per share (diluted).  Excluding the non-recurring gains and the cumulative change in accounting principle, earnings per share (diluted) for the three-month period ended September 30, 2003 were $.72, an 11% increase from the earnings recorded in the third quarter of 2002. Revenues increased 10% to $896 million in the three-month period and by 11% to $2.69 billion in the nine-month period ended September 30, 2003.  As of September 30, 2003, the Company's balance sheet debt, net of cash, was $615 million and its shareholders' equity was $1.023 billion.

21.    Additionally, the Company stated that operating margins for the Company's acute care hospitals located in the U.S. and Puerto Rico owned in both the three-month periods ended September 30, 2003 and September 30, 2002, increased to 17.0% from 16.7%.  Operating margins for the Company's behavioral health hospitals owned in both periods increased to 22.3% during the third quarter of 2003 from 19.2% during the prior year quarter.  The Company's operating margin increased to 15.4% in the three-month period ended September 30, 2003, as compared to 15.3% in the same period of the prior year.

22.    On November 10, 2003, the Company filed its quarterly report with the SEC on Form 10-Q.  The Company's Form 10-Q was signed by the Individual Defendants.  Therein, the Company reaffirmed its previously announced financial results and represented the following:

> The consolidated financial statements included herein have been prepared by the Company, without audit, pursuant to the rules and regulations of the Securities and Exchange Commission and reflect all normal and recurring adjustments which, in the opinion of the Company, are necessary to fairly present results for the interim periods.  Certain information and footnote disclosures normally included in financial statements prepared in accordance with generally accepted accounting principles have been condensed or omitted pursuant to such rules and regulations, although the Company believes that the accompanying disclosures are adequate to make the information presented not misleading.

***

11

Management of the Company believes that operating income, a non-GAAP financial measure as defined above, is helpful to investors as measures of the Company's operating performance. Since the source of financing for the purchase of property and equipment and other assets at each hospital varies, the Company believes that measuring operating performance before capital-related costs (such as depreciation and amortization, lease and rental and interest expense) provides a useful comparison of relative operating performance among its facilities. Operating income is used by management as an analytical indicator for purposes of assessing the relative operating performance of the Company's individual hospitals and operating segments, and the overall Company. In addition, the Company's use of operating income enables investors to compare the performance of the Company with that of others in the industry. To obtain a complete understanding of the Company's financial performance, operating income should be examined in connection with net income, determined in accordance with generally accepted accounting principles, as presented in the financial statements elsewhere in this Quarterly Report on Form 10-Q. Since the items excluded from operating income are significant components in understanding and assessing financial performance under generally accepted accounting principles, these measures should not be considered to be an alternative to net income as a measure of the Company's operating performance or profitability. Because operating income is not a measurement determined in accordance with generally accepted accounting principles and is therefore susceptible to varying calculations, operating income as presented may not be comparable to other similarly titled measures of other companies. Investors are encouraged to use GAAP measures when evaluating the Company's financial performance.

Operating income increased 11% to $138 million for the three month period ended September 30, 2003 from $125 million in the comparable prior year quarter. Overall operating margins were 15.4% and 15.3% during the three month periods ended September 30, 2003 and 2002, respectively. The slight increase in the overall operating margin during the three month period ended September 30, 2003, as compared to the comparable prior year period, resulted from a decrease in the provision for doubtful accounts to 6.9% of net revenues during the third quarter of 2003 as compared to 7.7% in the comparable prior year quarter, partially offset by an increase in salaries, wages and benefits to 40.4% of net revenues during the 2003 third quarter as compared to 39.8% in the comparable prior year quarter. Contributing to the increase in salaries, wages and benefits during the third quarter of 2003 as

compared to the comparable prior year quarter was an increase of
.4% of net revenues in employee benefit expense.

23.     On January 29, 2004, UHS stated that it expected to report earnings per diluted share of $.75 for the fourth quarter ended December 31, 2003 and $3.20 for the year ended December 31, 2003 and adjusted earnings per diluted share of $.73 for its fourth quarter ended December 31, 2003 and $3.11 for the year ended December 31, 2003.  Included in the expected reported earnings per diluted share for the fourth quarter ended December 31, 2003 was: (i) a previously disclosed increase of $.08 per diluted share resulting from the reversal of an accrued liability (including accrued interest) due to a favorable Texas Supreme Court decision which reversed an unfavorable 2000 jury verdict and 2001 appellate court decision; (ii) an increase of $.07 per diluted share resulting from a gain realized on the disposition of an investment in a health care related company, and; (iii) a reduction of $.13 per diluted share resulting from the write-down of the carrying value of an acute care pediatric hospital located in Puerto Rico to its estimated net realizable value. Included in the expected reported earnings per diluted share for the year ended December 31, 2003, in addition to the fourth quarter items mentioned above, were previously disclosed gains totaling $.07 per diluted share realized on the sales of radiation therapy centers, medical office buildings and an outpatient surgery center all of which were sold during the third quarter ended September 30, 2003.   The Company further stated that it anticipated net revenues for 2004 to exceed $4.2 billion and earnings per diluted share of $3.43 to $3.53.

24.     On February 18, 2004, UHS announced its results for the fourth quarter and full year ended December 31, 2003.  The Company reported that net income was $46.5 million or $.75 per diluted share during the fourth quarter of 2003, as compared to $43.9 million or $.69 per diluted share during the fourth quarter of 2002. For the full year of 2003, reported net income

was $199.3 million or $3.20 per diluted share as compared to $175.4 million or $2.74 per diluted share during 2002.  Included in the reported results for the fourth quarter ended December 31, 2003 were the items listed in ¶ 25.  Included in the reported results for the year ended December 31, 2003, in addition to the fourth quarter items mentioned above, were previously disclosed after-tax (and after-minority interest) gains amounting to $4.4 million or $.07 per diluted share realized on the sales of radiation therapy centers, medical office buildings and an outpatient surgery center, all of which were sold during the third quarter ended September 30, 2003. Excluding the items listed in ¶ 25 from the three month period ended December 31, 2003 and excluding an after-tax recovery of closure costs of $1.4 million or $.02 per diluted share included in the three month period ended December 31, 2002, adjusted net income and adjusted earnings per diluted share increased 6% to $45.3 million and 9% to $.73, respectively, during the fourth quarter of 2003 as compared to $42.5 million and $.67, respectively, in the prior year quarter. Net revenues increased 14% during the three month period ended December 31, 2003 to $949.5 million as compared to $835.5 million during the prior year's fourth quarter. During the quarter ended December 31, 2003, EBITDA (earnings before interest, depreciation and taxes), increased 10% to $121.5 million as compared to $110.7 million during the prior year's fourth quarter.

25.     The Company also reported that for the year ended December 31, 2003, adjusted net income and adjusted earnings per diluted share increased 11% and 14%, respectively, to $193.7 million and $3.11 as compared to $174.0 million and $2.72, respectively, during 2002. During 2003, net revenues increased 12% to $3.64 billion as compared to $3.26 billion during 2002.  EBITDA increased 13% during 2003 to $490.7 million as compared to $434.6 million during 2002.

26.    Commenting on these results, defendant Miller stated:

"Our hospitals owe their success to a responsive management style, and to a service philosophy that is based on integrity, competence and compassion. The UHS strategy is to build or purchase health care properties in rapidly growing markets, and then create a strong franchise based on exceptional service and effective cost control. The efforts of the many talented people at UHS produced solid financial results even though hospitals continue to be challenged by sluggish volumes. In addition to continuing to invest aggressively to provide the health care needed by our existing communities, UHS will also continue to look selectively to acquire hospitals where we believe our skills can improve the quality and financial viability of the hospital."

27.    UHS further stated that the Company's provision for doubtful accounts was 7.8% of net revenues during the fourth quarter of 2003 as compared to 6.9% during the prior year's fourth quarter. The increase resulted primarily from an increase in uninsured and self-pay patients which unfavorably impacts the collectibility of our patient accounts. Moreover, the Company expected this trend to continue until there is a notable strengthening of the labor market.

28.    The statements contained in ¶¶ 19-29 are alleged in the Class Actions to have been each materially false and misleading because defendants Miller and Filton failed to disclose and indicate:  (1) that the Company was facing heightened competition in certain markets such as McAllen, Texas, Las Vegas, Nevada, and Aiken, South Carolina and that this competition was eroding the Company's market share; (2) that UHS's payor mix was deteriorating because the Company was starting to see a rise in admittance to its hospitals of self-pay and uninsured patients; (3) that due to the rise in self-pay and uninsured patients, the Company's bad debt expense ratio rose to unacceptable levels; (4) that the length of stay on Medicare cases at Universal Health facilities was increasing due to poor case management discipline; (5) that the Company failed to write-off uncollectible receivables; (6) by failing to write-off uncollectible

receivables, UHS materially overstated its financial results; (7) that the Company's allowance for doubtful accounts was insufficient, thereby causing the Company to materially overstate its operating income; and (8) that as a result of this failure, the Company's reported operating income did not serve as a true measure of its operating performance.

**The Truth Begins to Emerge**

29.     On March 1, 2004, the Company announced that its earnings per diluted share for the three-month period ending March 31, 2004, could be as much as 25% lower than the $.84 per diluted share recorded in the same period in the prior year.  On a same facility basis, the Company's acute care hospitals had continued, in the first two months of 2004, to experience a decline in inpatient admissions.  Moreover, during this period, certain of the Company's acute care facilities had been impacted by a negative shift in payor mix, a decline in intensity and an increase in length of stay.  In addition, the rising level of uninsured and self-pay patients continued to unfavorably impact our bad debt expense.

30.     News of this shocked the market.  Shares of UHS fell $9.05 per share, or 16.78%, to close at $44.88 per share on March 1, 2004.

**UNIVERSAL HEALTH'S ALLEGED VIOLATIONS OF GAAP RULES**

31.     As alleged in the Class Actions, defendants Miller and Filton herein caused the Company to announce financial results which were allegedly in violation of GAAP, the Company's own announced revenue recognition policies, and the following principles:

a.      The principle that "interim financial reporting should be based upon the same accounting principles and practices used to prepare annual financial statements" was violated (APB No. 28, ¶10);

b.     The principle that "financial reporting should provide information that is useful to present to potential investors and creditors and other users in making rational investment, credit, and similar decisions" was violated (FASB Statement of Concepts No. 1, ¶34);

c.     The principle that "financial reporting should provide information about the economic resources of an enterprise, the claims to those resources, and effects of transactions, events, and circumstances that change resources and claims to those resources" was violated (FASB Statement of Concepts No. 1, ¶40);

d.     The principle that "financial reporting should provide information about an enterprise's financial performance during a period" was violated   (FASB Statement of Concepts No. 1, ¶42);

e.     The principle that "completeness, meaning that nothing is left out of the information that may be necessary to insure that it validly represents underlying events and conditions" was violated (FASB Statement of Concepts No. 2, ¶79);

f.     The principle that "financial reporting should be reliable in that it represents what it purports to represent" was violated  (FASB Statement of Concepts No. 2, ¶¶58-59); and

g.     The principle that "conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered" was violated.  (FASB Statement of Concepts No. 2, ¶95).

32.     The adverse information allegedly concealed by the defendants Miller and Filton during the Class Period was in violation of Item 303 of Regulation S-K under the federal securities law (17 C.F.R. 229.303).

33.     To the extent that the Defendant Miller and Filton's acts or omissions caused the Company to violate the securities law as alleged in the Class Actions, they are liable to the Company for any damages caused thereby, and must reimburse the Company for the harm it has incurred and will continue to incur, including legal and accounting costs, and the costs of defending and settling any securities fraud class actions and/or any verdict rendered against it.

34.     The Individual Defendants have also violated their fiduciary duties owed to UHS and are liable to the Company for the damages caused the Company as a result of the wrongful conduct alleged herein.

35.     The Individual Defendants sold material amounts of UHS securities during the time that material adverse information was withheld from UHS shareholders. As a result, the Individual Defendants were unjustly enriched and are liable to UHS for the profits realized for such securities sales.

### DEMAND EXCUSED ALLEGATIONS

36.     Plaintiff is an owner of UHS common stock and was an owner of UHS common stock during the time period relevant to the Individual Defendants' wrongful course of conduct alleged herein through the present.

37.     UHS' Board of Directors is currently composed of six (6) directors - Leatrice Ducat, John H. Herrell, Robert H. Hotz, Alan B. Miller, John F. Williams, Jr. and Anthony Pantaleoni.  Miller has been named as a defendant herein.

38.     Defendant Miller, as CEO, President and Chairman of the Board, assumed important managerial responsibilities which required him to be well informed about the day-to-day operations of the Company, and he had primary responsibility for assuring that the Company's financial records were accurate.  Defendant Miller breached these duties by actively

participating in, encouraging, sponsoring, and/or approving many of the wrongful acts or omissions complained of herein and/or purposefully or recklessly disregarding these wrongful acts or omissions. UHS' Board of Directors is dominated by Miller, the founder of the Company and with his wife, and family foundation is its largest shareholder, controlling 83.8 percent of the voting power of the Company and thereby effectively controlling the direction of the Company, including the composition of the Company's Board of Directors and the retention of its members.

39.     Demand on the UHS Board of Directors to institute this action is not necessary because such a demand would be a futile and useless act, also for the following reasons:

a.     A majority of the directors of UHS, as detailed herein, participated in, approved and/or permitted the wrongs alleged herein to have occurred and some are the principal beneficiaries of the wrongdoing alleged herein and/or participated in efforts to conceal or disguise those wrongs from UHS stockholders and investors, or are otherwise not independent as alleged in the Complaint and are therefore not disinterested parties, and thus could not fairly and fully prosecute such a suit even if such suit was instituted by them;

b.     Defendant Miller owns a majority of the common stock of the Company and control UHS's direction as well as the composition of its Board of Directors.  Defendant Miller controls 83.8 percent  of the voting power of the Company and effectively controls and directs the Company himself, including the composition of the Company's Board of Directors. The Board is dominated by Miller.  Miller's dominance over the Board and the control and direction of the Company is evidenced by, among other things, his total control of the voting power;

c.      The UHS Directors had a responsibility and obligation to insure that all press releases and filings of SEC reports, including all financial reports, were accurate and that all financial controls and other oversight procedures were in place that would have detected and prevented that false and misleading statements put out by the Company to the public that are further described in this Complaint. The Defendants failed to properly discharge their duties, and are implicated in the wrongdoing, and thus there is not a disinterested majority of the UHS Board to properly consider pre-suit demand;

d.      In order to bring this suit, the UHS Board would be forced to sue themselves and/or persons with whom they have extensive business and personal entanglements, which they will not do, thereby excusing demand;

e.      The acts complained of constitute violations of state law and the fiduciary duties owed by UHS officers and directors and are incapable of ratification;

f.      The actions of the Directors have impaired the Board's ability to validly exercise its business judgment and rendered it incapable of reaching an independent decision as to whether to consider a pre-suit demand;

g.      Defendant Miller is currently a defendant in a number of securities class action lawsuits arising out of the wrongdoing alleged herein and a suit by the UHS Board to remedy the wrongs alleged herein would likely expose the Defendants and UHS to further violations of securities law which would result in additional civil actions being filed against one or more of the Defendants; thus they are hopelessly conflicted in making any supposedly independent determination as to whether to sue themselves;

h.      UHS has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein; yet, the Defendants have not filed any lawsuits against

themselves or others who were responsible for that wrongful conduct which caused the filing of securities class actions against UHS; nor have they attempted to recover any part of the damages UHS suffered and will suffer thereby or the illegal insider trading proceeds reaped by themselves and others;

      i.     If the Defendants were to bring this derivative action against themselves, they would thereby expose their own negligence and misconduct which underlies allegations against the Company contained in the class action complaints for violations of federal securities law.  Such admissions would impair the Company's and their defense of the Class Actions and greatly increase the probability of their personal liability in the Class Actions in an amount likely to be in excess of any insurance coverage available to the Defendants;

      j.     The Defendants are believed to be covered by an insurance policy which covers the type of misconduct alleged herein, which policy would likely preclude coverage, if any, if the Defendants initiated action against any of the other Defendant named herein. Therefore, the UHS Board, or any committee thereof, is effectively disabled from complying with any demand that would cause the Company to bring suit against the Defendants because to do so would result in the loss of their insurance coverage;

      k.     Of the six UHS directors, two—Miller and Pantaleoni—are acknowledged by UHS not be independent directors, while another director, John Williams, would not be able to independently consider bringing an action that would be to the detriment of defendant Miller since Williams is University Provost of George Washington University, an institution which depends to a significant extent on the goodwill of Miller due to Miller's control over the partnership which owns and manages the crucial George Washington University Hospital. Further, a majority of UHS directors approved an employee retention program under which

employees were granted loans which were forgiven if the employee remained with the company for a certain number of years. Under this program, the directors approved loans of $7.6 million in corporate funds to defendant Miller despite the fact that the likelihood of defendant Miller leaving UHS were nil due to his control over the Company, and his ownership of approximately $250 million worth of UHS stock. The UHS Directors would have to have known that such a loan (which UHS has indeed forgiven) was nothing other than a giveaway of Company funds and a waste of corporate assets, which had no purpose other than to further enrich defendant Miller. That this wasteful transaction was approved, demonstrates the domination and control of Miller. For these reasons, and others detailed herein, a majority of the UHS Directors are not independent, and could not fairly consider pre-suit demand; and

       l.     A majority of the UHS directors are not disinterested and independent because while in possession of material non-public information, many sold UHS shares. Defendant Miller disposed of 102,587 shares of his own stock for proceeds totaling $5,181,245. Any suit filed to recovery on behalf of the Company would implicate their own conduct and cause them to be targets of such suit. Therefore, reasonable doubt exists that the a majority of the UHS Board could fairly consider the institution of suit under such circumstance.

      40.     Plaintiff has not made any demand on the shareholders of UHS to institute this action since such demand would be a futile and useless act for the following reasons:

       a.     UHS is a publicly traded company with thousands of shareholders;

       b.     Making demand on such a number of shareholders would be impossible for Plaintiff, who has no way of finding out the names, addresses or telephone numbers of shareholders; and

c.      Making demand on all shareholders would force Plaintiff to incur huge expenses, assuming all shareholders could even be individually identified.

41.      Plaintiff will adequately and fairly represent the interests of UHS in enforcing and prosecuting its rights.

## FIRST CAUSE OF ACTION
### (Against Defendants Miller and Filton for Contribution
### Pursuant to Sections 10(b) and 21D of the Exchange Act)

42**.**      Plaintiff incorporates by reference and realleges each and every allegation set forth above as though fully set forth herein.

43.      This Court has jurisdiction over this cause of action pursuant to 28 U.S.C § 1331 (federal question jurisdiction) since it arises under both Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j(b), under which there is a private right of action for contribution, and Section 21D of the Private Securities Litigation Reform Act, 15 U.S.C. § 78u-4, which governs the application of any private right of action for contribution asserted pursuant to the Exchange Act.   Prior to Congress enacting an express provision for contribution under the Section 21D of the Exchange Act, the United States Supreme Court recognized that a federal cause of action existed for contribution claims pursuant to Section 10(b) of the Exchange Act and Rule 10b-5.   *See Musick, Peeler & Garrett v. Employers Insurance of Wausau*, 508 U.S. 286 (1993).   This Court therefore has federal question subject matter jurisdiction over the Federal contribution claim alleged herein.

44.      Defendant Miller as the Company's Chairman and Chief Executive Officer and defendant Filton as the Company's Chief Financial Officer had a duty not to defraud the investing public by the dissemination of materially false and misleading press releases and the dissemination of materially false and misleading financial statements.

23

45.     Both of these defendants have been sued in the Class Actions alleging that these individual defendants caused the Company to issue materially false financial statements concerning *inter alia* reserves for bad debts, and, as a result, the Company and these defendants violated Section 10(b) of the Exchange Act.

46.     As alleged in the Class Actions, these individual defendants acted with scienter in that these individual defendants knew that the public documents and statements issued or disseminated by or in the name of the Company were materially false and misleading; knew or recklessly disregarded that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violators of the federal securities laws.   These individual defendants, by virtue of their receipt of information reflecting the true facts regarding UHS and its business practices, their control over and/or receipt of UHS's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning UHS, were active and culpable participants in the fraudulent scheme alleged herein.   These individual defendants knew and/or recklessly disregarded the falsity and misleading nature of the information which they caused to be disseminated to the investing public.   The ongoing alleged fraudulent scheme alleged in the Class Actions could not have been perpetrated over a substantial period of time without the knowledge and complicity of the personnel at the highest level of the Company, including these individual defendants. During the Class Period, Company insiders sold 156,202 of shares of UHS stock at artificially inflated prices for proceeds of $7,951,999 and defendant Miller, alone, sold 102,587 UHS shares for proceeds of $5,181,245.

47.    The federal statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements.    None of the statements pleaded herein which were forward-looking statements were identified as "forward-looking statements" when made.    Nor was it stated that actual results "could differ materially from those projected."    Nor were the forward-looking statements pleaded accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from the statements made therein.

48.    At all relevant times, the market for UHS stock was an efficient market for the following reasons, among others:

(a)    stock met the requirements for listing, and was listed and actively traded, on the NYSE, a highly efficient market;

(b)    a regulated issuer, UHS filed periodic public reports with the SEC and the NASD;

(c)    UHS stock was followed by securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms and that were publicly available and entered the public marketplace; and

(d)    UHS regularly issued press releases which were carried by national newswires.  Each of these releases was publicly available and entered the public marketplace.

49.    As a result, the market for UHS securities promptly digested current information with respect to UHS from all publicly-available sources and reflected such information in UHS's stock price. Under these circumstances, all purchasers of UHS securities during the Class Period suffered similar injury through their purchase of stock at artificially prices.

50.     During the Class Period, it is alleged in the Class Actions that defendants Miller and Filton caused UHS to carry out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of UHS securities; and (iii) cause plaintiff and other members of the Class to purchase UHS stock at artificially inflated prices.

51.     As alleged in the Class Actions, these defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for UHS securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5. These defendants are sued as primary participants in the wrongful and illegal conduct charged herein.

52.     In addition to the duties of full disclosure imposed on these defendants as a result of their making of affirmative statements and reports, or participation in the making of affirmative statements and reports to the investing public, they each had a duty to disseminate truthful information promptly that would be material to investors in compliance with the integrated disclosure provisions of the SEC as embodied in SEC Regulation S-X (17 C.F.R. § 210.01 et seq.) and S-K (17 C.F.R. §229.10 et seq.) and other SEC regulations, including accurate and truthful information with respect to the Company's operations, financial condition and performance so that the market prices of the Company's publicly traded securities would be based on truthful, complete and accurate information.

53.     It is alleged in the Class Actions that these defendants, individually and in concert, directly and indirectly, by the use of the mails or other means or instrumentalities of interstate commerce, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, business practices, performance, operations and future prospects of UHS as specified herein.  These defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of UHS's value and performance and substantial growth.  This included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about UHS and its business, operations and future prospects in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaging in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of UHS securities during the Class Period.

54.     As alleged in the Class Actions, as a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of UHS's securities was artificially inflated during the Class Period. Unaware of the fact that the market price of UHS's shares was artificially inflated, and relying directly or indirectly on the false and misleading statements made by these defendants, or upon the integrity of the market in which the securities trade, and/or on the absence of material adverse information that was known to or recklessly disregarded by these defendants but not disclosed in public statements during the Class Period, and Class members acquired UHS securities during the Class Period at artificially high prices and were damaged thereby.

55.     As alleged in the Class Actions, at the time of said misrepresentations and omissions, the Class members were unaware of their falsity, and believed them to be true.   Had the Class members of the Class and the marketplace known of the true performance, business practices, future prospects and intrinsic value of UHS, which were not disclosed by these defendants, plaintiff and other members of the Class would not have purchased or otherwise acquired their UHS securities during the Class Period, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

56.     As alleged in the Class Actions, by virtue of the foregoing, these defendants each violated Section 10(b) of the Exchange Act and Rule 10b-5.

57.     It is further alleged in the Class Actions that the Company participated in the wrongful conduct and is equally liable for violation of  Section 10(b) of the Exchange Act and Rule 10b-5.   Assuming that the Company is liable, these individual defendants caused the Company to violate Section 10(b) of the Exchange Act, and Rule 10b-5 and incur liability for damages for violation of the Federal securities  laws.

58.     If the Company is deemed to have violated the Federal securities laws, and incurs damages therefore, these individual defendants are liable to the Company for contribution pursuant to Section 21(D) of the Exchange Act.

### SECOND CAUSE OF ACTION
### (Against all Individual Defendants for Breach of Fiduciary Duty)

59.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

60.     This Court also has subject matter jurisdiction over the second cause of action herein  pursuant to 28 U.S.C. §  1367 (supplemental jurisdiction), since this statute provides that

the district court has supplemental jurisdiction over all other claims asserted where, as here, they are so related to claims in the action within the original jurisdiction of the Court that they form part of the same case or controversy. This claim arises out of the same course of conduct as alleged with respect to the first cause of action herein, and is part of the same case or controversy.

61.     The Individual Defendants owed and owe UHS fiduciary obligations.  By reason of their fiduciary relationships, the Individual Defendants owed and owe UHS the highest obligations of good faith, fair dealing, loyalty and due care.

62.     The Individual Defendants breached their fiduciary duties of care, loyalty, reasonable inquire, oversight, good faith and supervision.

63.     Each of the Individual Defendants had actual or constructive knowledge that they had caused UHS to improperly misrepresent the financial results of the Company and failed to correct publicly reported financial results and guidance.  These actions could not have been a good faith exercise of prudent business judgment.

64.     As a direct and proximate result of the Individual Defendants' misconduct, and/or inaction, UHS has suffered and will continue to suffer significant damages.  As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

**THIRD CAUSE OF ACTION**
**(Against All Individual Defendants for Breach of Fiduciary**
**Unjust Enrichment and Abuse of Control)**

65.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as if though fully set forth herein.

66.     This Court also has subject matter jurisdiction over the third cause of action herein  pursuant to 28 U.S.C. §  1367 (supplemental jurisdiction), since this statute provides that

the district court has supplemental jurisdiction over all other claims asserted where, as here, they are so related to claims in the action within the original jurisdiction of the Court, that they form part of the same case or controversy. This claim arises out of the same course of conduct as alleged with respect to the first cause of action herein, and is part of the same case or controversy.

67.     The Individual Defendants' misconduct and/or inaction alleged herein constituted an abuse of their ability to control and influence UHS, for which they are legally responsible. Moreover, defendant Miller sold UHS shares during the Class Period while in possession of material, non-public information, and are required to disgorge to the Company all profits received thereby.

68.     As a direct and proximate result of the Individual Defendants' abuse of control, UHS has sustained significant damages, and Individual Defendants are liable to the Company.

### FOURTH CAUSE OF ACTION
### (Against All Individual Defendants for Breach of Fiduciary through Mismanagement)

69.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as if though fully set forth herein.

70.     This Court also has subject matter jurisdiction over the fourth cause of action herein  pursuant to 28 U.S.C. § 1367 (supplemental jurisdiction), since this statute provides that the district court has supplemental jurisdiction over all other claims asserted where, as here, they are so related to claims in the action within the original jurisdiction of the Court, that they form part of the same case or controversy. This claim arises out of the same course of conduct as alleged with respect to the first cause of action herein, and is part of the same case or controversy.

71.     By their actions alleged herein, the Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of UHS in a manner consistent with the operations of a publicly held corporation.

72.     As a direct and proximate result of the Individual Defendants' mismanagement, UHS has sustained significant damages, arising out of the alleged material misstatements to the investing public, damages to the company arising from the pendency of the class actions and Individual Defendants are liable to the Company for all damages flowing therefrom, including the obligations for common law contribution.

**PRAYER FOR RELIEF**

WHEREFORE, plaintiff prays for judgment as follows:

A.     Against Defendants Miller and Filton for contribution pursuant to Sections 10(b) and 21(D) of the Exchange Act;

B.     Against the Individual Defendants for the damages sustained by UHS as a result of the breaches of fiduciary duty, abuse of control, mismanagement, waste of corporate assets and unjust enrichment;

C.     Equitable and/or injunctive relief as permitted by law;

D.     Restitution and disgorgement of profits;

E.     Attorneys fees and costs; and

F.     Such other and further relief as may be just and proper.

## <u>JURY DEMAND</u>

Plaintiff demands a trial by jury.

Dated:  October 18, 2004                                    Respectfully submitted,

_____

Brian M. Felgoise, Esquire
**LAW OFFICES OF BRIAN M.**
**FELGOISE, P.C.**
261 Old York Road - Suite 423
Jenkintown, PA 19046
(215) 886-1900

- and –

Laurence D. Paskowitz, Esquire
**PASKOWITZ & ASSOCIATES**
60 East 42nd Street - 46th Floor
New York, NY 10165
(212) 685-0969

- and -

Richard B. Brualdi, Esquire
**THE BRUALDI LAW FIRM**
29 Broadway
New York, NY 10006
(212) 952-0602

*Attorneys for Plaintiff*